339 F.3d 101
 Wisdom Import Sales Company, L.L.C., Plaintiff-Appellee,
v.
Labatt Brewing Company Limited, Labatt Holdings, Inc., Labatt Usa, L.L.C., Lf Holdings I L.L.C., and Interbrew, S.A., Defendants-Appellants.
 Docket No. 02-7579.
 United States Court of Appeals, Second Circuit.
 Argued: August 7, 2002.
 Decided: August 7, 2003.
 
 COPYRIGHT MATERIAL OMITTED David B. Tulchin, Sullivan & Cromwell, New York, NY (Michael T. Tomaino, Jr., Sullivan & Cromwell, New York, NY, on the brief), for Defendants-Appellants Labatt Brewing Company Limited, Labatt Holdings, Inc., Labatt USA L.L.C., LF Holdings I L.L.C., and Interbrew, S.A.
 Stephen R. Neuwirth, Boies, Schiller & Flexner LLP, New York, NY (David A. Barrett and Steven I. Froot, Boies, Schiller & Flexner LLP, New York, NY, on the brief), for Plaintiff-Appellee Wisdom Import Sales Company, L.L.C.
 Before: JACOBS, CABRANES, and F.I. PARKER, Circuit Judges.
 F.I. PARKER, Circuit Judge.
 
 
 1
 Defendants-Appellants Labatt Brewing Company Limited ("Labatt"), its wholly-owned subsidiary Labatt Holdings, Inc., its partially-owned subsidiaries LF Holdings I L.L.C. ("LF I") and Labatt USA L.L.C. ("LUSA"), and its parent company Interbrew, S.A. ("Interbrew") (collectively "Appellants") appeal from the judgment of the United States District Court for the Southern District of New York (John S. Martin, Jr., Judge) entered on May 23, 2002, granting the motion of Plaintiff-Appellee Wisdom Import Sales Company, L.L.C. ("Wisdom") for a preliminary injunction and enjoining Appellants from proceeding further with the integration of the beer brands of Beck & Co. ("Beck") into LUSA (the "Beck's integration"). In granting injunctive relief, the district court ruled that Appellants breached a contract governing terms and conditions of a joint venture between Wisdom and Appellants. The district court found that Appellants' breach denied Wisdom the benefit of certain bargained-for minority rights of corporate governance and that such denial constituted irreparable harm.
 
 
 2
 For the reasons set forth herein, we conclude that the district court did not abuse its discretion when it granted Wisdom's motion for injunctive relief. Accordingly, we affirm.
 
 I. BACKGROUND
 A. General Corporate Relationships
 
 3
 Through the seemingly complex maze of various business entities in this case lies a most palatable enterprise: beer distribution. In 1994, Labatt[1] and various of its wholly-owned subsidiaries entered into a 99-year joint venture with FEMSA Cerveza, S.A. de C.V. ("FEMSA") of Mexico and its wholly-owned subsidiary Wisdom. The principal purpose of the joint venture was to establish a single distribution infrastructure through which Labatt and FEMSA could distribute in the United States their current and future brands of beer and malt-based beverages, as well as the brands of their current and future affiliates. The joint venture was primarily governed by a joint venture agreement.
 
 
 4
 Established in connection with the joint venture was LF I, a Delaware limited liability corporation. Labatt, through two of its wholly-owned subsidiaries[2], owns 70% of LF I. FEMSA, through Wisdom, owns 30% of LF I. LF I, in turn, owns substantially all of LUSA, an operating subsidiary created in connection with the joint venture. From its formation, LUSA has served as the exclusive distributor of the Labatt and FEMSA brands of beer, importing, marketing and selling those brands in the United States. Interbrew, a Belgian corporation, became a party to the joint venture after acquiring Labatt in 1995. Pursuant to this acquisition, LUSA began distributing Interbrew's beer brands (in addition to the Labatt brands already distributed by LUSA) in the United States.
 
 
 5
 In conjunction with the joint venture agreement itself, and pertinent to this appeal, the terms and conditions of the joint venture are further governed by three additional agreements: (1) an "Amended and Restated Limited Liability Company Agreement of LF Holdings I, L.L.C." ("LF I Agreement"); (2) a "Principal Owners and Members Agreement" ("POM Agreement"); and (3) an "Exclusive Distributor Agreement" between LUSA and Labatt ("Labatt Distributor Agreement").
 
 
 6
 The LF I Agreement is between the two Labatt wholly-owned subsidiaries that partially own LF I and Wisdom. It sets forth corporate governance principles for LF I. According to this agreement, "the business and affairs of [LF I] shall be managed by or under the direction of the Board of Directors." LF I Agmt., § 3.1. The LF I Board consists of seven directors, five of whom are appointed by a Labatt subsidiary ("Labatt directors") and two of whom are appointed by Wisdom ("Wisdom directors"). Pursuant to section 2.7 of the LF I Agreement, ordinary business decisions are determined by simple majority vote of the Board which, it is agreed by all parties, accords the Labatt directors virtual unlimited control over day-to-day business operations of both LF I and LUSA.[3] However, decisions involving certain "fundamental matters," as delineated by section 2.9 of the LF I Agreement, require a super-majority vote for approval, that is, no fewer than six members of the LF I Board. As negotiated for by Wisdom, these fundamental matters require the favorable vote of at least one Wisdom director for approval. Section 2.9, thus, effectively vests Wisdom with a "minority veto" power over fundamental matters. As relevant to this appeal, "fundamental matters" includes related-party agreements, described in section 2.9(v) as "the entry by [LF I] or any of its subsidiaries into or material modifications of any agreement with any Member or any of their respective affiliates," LF I Agmt., § 2.9(v).
 
 
 7
 Just as the LF I Agreement governs operation of LF I, the POM Agreement sets forth the manner in which LUSA will be managed, including principles regarding the marketing of beer brands within LUSA's portfolio. With respect to LUSA's marketing efforts, the POM Agreement requires a balanced approach in connection with each brand LUSA distributes and provides minority owner FEMSA with protections against unfair discrimination in LUSA's marketing efforts. Although section 7.2(c)(I) of the POM Agreement requires "balanced" marketing efforts by LUSA, ultimately, such efforts are to be "based on the best interests of LF I without regard to the financial interests of any Principal Owner in any Supplier...." POM Agmt., § 7.2(c)(I).
 
 
 8
 Finally, LUSA entered into the Labatt Distributor Agreement with Labatt and its affiliates.[4] The Labatt Distributor Agreement grants LUSA exclusive 99-year United States distribution rights to Labatt's "current brands," defined as beer brands brewed by Labatt and its affiliates at inception of the distribution arrangement. The Labatt Distributor Agreement also contemplates that "new brands," defined as brands that Labatt and its "current and future affiliates ... may in the future manufacture" outside the United States, might be added to LUSA's portfolio. It specifies procedures for such developments, including granting LUSA a "right of first refusal" with respect to the distribution rights for any such new brands and, if exercised, LUSA's right to be appointed as exclusive distributor of such new brands in the United States according to the terms and conditions agreed upon by LUSA, Labatt, and the supplier of the new beer brand.
 
 
 9
 Of particular significance to the integration of any "new brands" into LUSA's portfolio is section 4 of the Labatt Distributor Agreement. Section 4 imposes a mandatory good faith negotiation requirement on LUSA if it or one of its affiliates acquires a brewing company whose brands have a "significant market presence" in the United States. In the event that such a transaction presents itself, LUSA, Labatt and the new brand supplier:
 
 
 10
 [A]gree that they shall negotiate in good faith for such brands to become [Labatt] Brands on terms and conditions consistent with the then applicable terms and conditions of the [Labatt] Brands and such other consideration as Importer and Suppliers or Labatt, as the case may be, shall deem equitable and appropriate under the circumstances.
 
 
 11
 Labatt Distrib. Agmt., § 4. Therefore, LUSA's right of first refusal is not absolute with respect to new brands with a significant market presence. The parties to any proposed integration of such new brands must negotiate in good faith, but need not agree upon, the terms of a new distribution arrangement. It is undisputed that the Beck's brands, which account for approximately 3.4 — 4.2% of total beer and malt beverages imports into the United States, are considered new brands having a significant market presence.
 
 B. The Dispute Brews
 
 12
 In August 2001, Interbrew announced a deal to purchase Beck, a German brewer. At the time Interbrew acquired Beck, Beck's North America ("Beck's NA"), a wholly-owned subsidiary of Beck, was, and continues to be, the exclusive United States distributor of the Beck's brands of beer. Initially, Interbrew considered an acquisition of Beck's NA, but abandoned the idea when FEMSA voiced opposition to the proposal. Interbrew then sought to terminate the distribution arrangement between Beck and Beck's NA and, instead, have LUSA distribute Beck's brands directly. Since acquiring Beck, however, Interbrew has been operating two parallel United States distribution operations for the imported brands it owns: LUSA and Beck's NA.
 
 
 13
 In the months following Interbrew's August 2001 announcement, FEMSA attempted to obtain more information about the deal in order to enable Wisdom to make an informed decision about whether or not to approve the Beck's integration. It is clear that, even in these early stages, the parties disagreed regarding the degree to which Wisdom could veto the integration. FEMSA and Wisdom posited that such an acquisition would require, at a minimum, LUSA agreeing to distribute Beck's brands which, in turn, constitutes a "fundamental matter" under section 2.9 of the LF I Agreement requiring a super-majority vote. Despite these concerns, Appellants proceeded with preliminary steps to effectuate the Beck's integration.
 
 
 14
 In April 2002, Wisdom requested a meeting of the LF I Board to vote on the proposed integration. On April 25, 2002, a Board meeting convened during which Labatt, on behalf of its parent Interbrew, presented a resolution to integrate Beck's brands into LUSA's portfolio (the "Resolution"). The Resolution stated:
 
 
 15
 1. The addition by [LF I] of all Beck's brands currently distributed by [Beck's NA] (the "Beck's Brands") to the Exclusive Distribution Agreement between [Labatt], [LUSA], et al, dated as of December 1, 1994, is hereby approved, ratified and confirmed.
 
 
 16
 2. Any two officers or directors of [LF I] are authorized and directed to execute and deliver for and in the name of and on behalf of [LF I] and under its corporate seal or otherwise, all such certificates, instruments, agreements, amendments, bills of sale, notices, affidavits, and other documents and to do all such other acts and things as, in the opinion of such persons, may be necessary or desirable in connection with the integration of Beck's Brands and with the performance by [LF I] of its obligations hereunder.
 
 
 17
 Four Labatt directors (one Labatt directorship was vacant at the time of the vote) voted in favor of the Resolution, while the two Wisdom directors voted against it.
 
 
 18
 Labatt and Interbrew perceived the vote as a success, continuing to maintain that only a simple majority vote was required to approve the action. Wisdom, on the other hand, continued to believe what it had urged in the months preceding the vote on the Resolution: that the Beck's integration involved "fundamental matters," thereby requiring the approval of six LF I directors. However, Labatt intimated an intent to proceed with the Beck's integration despite not having obtained Wisdom's approval. After the vote, the Wisdom directors included in the LF I Board meeting minutes a statement reiterating Wisdom's position. Appellants nonetheless proceeded with the integration which included, among other things, a general restructuring and reorganization of LUSA as outlined in LUSA's "Long Range Plan 2003-2005" ("Long Range Plan").
 
 
 19
 On April 29, 2002, Wisdom filed a complaint alleging breach of the LF I Agreement. Wisdom sought a temporary restraining order and a preliminary injunction to enjoin the Beck's integration.
 
 C. District Court Ruling
 
 20
 On the date Wisdom filed its complaint, the parties agreed to a standstill of any action in furtherance of the Beck's integration pending a May 10, 2002 hearing before the district court. At the May 10 hearing, the parties presented oral arguments, but the district court postponed rendering a decision until an evidentiary hearing could be held on May 23, 2002. In the interim, the district court permitted each party to take three depositions prior to the hearing, which could then be used in lieu of live, direct testimony at the evidentiary hearing.
 
 
 21
 At the May 23 evidentiary hearing, the district court permitted cross-examination of several witnesses, as well as introduction of documentary evidence and the deposition testimony. The district court examined whether integrating Beck's brands into LUSA's portfolio required an agreement between LUSA and an affiliate (such as Interbrew, Labatt, or Beck) and whether Wisdom had established irreparable harm. After receiving all documentary and testimonial evidence, the district court found the Beck's integration involved the type of self-dealing agreement that section 2.9(v) of the LF I Agreement contemplated as a "fundamental matter." It concluded that proceeding with the Beck's integration over Wisdom's objection breached the LF I Agreement and that denying Wisdom the opportunity to exercise its bargained-for minority rights constituted irreparable harm in and of itself, thereby warranting injunctive relief.[5] The district court enjoined Appellants from taking further action on the Beck's integration during the pendency of proceedings. This timely appeal followed.
 
 II. DISCUSSION
 
 22
 The present appeal calls upon us to review the propriety of the district court's grant of preliminary injunctive relief to Wisdom. Appellants contend that such relief is not warranted because Wisdom failed to identify any agreement in which LUSA and an affiliate had entered or anticipated entering in furtherance of the Beck's integration. Approving the Resolution and proceeding with the Beck's integration, they contend, did not violate Wisdom's minority veto power under section 2.9(v) and, therefore, did not breach the LF I Agreement. Appellants also contend that, even if a breach occurred, Wisdom failed to demonstrate that it would suffer irreparable harm for which no adequate remedy at law would compensate.
 
 A. Standard of Review
 
 23
 We review the district court's grant of a preliminary injunction for an abuse of discretion. The Bronx Household of Faith v. Board of Educ. of City of New York, 331 F.3d 342, 348 (2d Cir.2003). A district court abuses its discretion in granting preliminary injunctive relief when it "bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." Id. We have previously noted that the highly deferential "clearly erroneous" standard is particularly appropriate when assessing a district court's factual findings due to that court's "expertise" as a fact-finder. Zervos v. Verizon New York, Inc., 252 F.3d 163, 168 (2d Cir.2001). The fact that we may disagree with the district court's factual findings, in itself, does not render those findings clear error. Rather, in order to clear this threshold, any disagreement on our part must be accompanied by a firm belief that the district court was mistaken. Id. (citing United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948)).
 
 B. Preliminary Injunctive Relief
 
 24
 Preliminary injunctive relief is appropriate when a plaintiff establishes "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [plaintiff's] favor." See TCPIP Holding Co., Inc. v. Haar Communications, Inc., 244 F.3d 88, 92 (2d Cir.2001).
 
 
 25
 Because, in this case, the existence of irreparable harm, vel non, turns on Wisdom's rights under the LF I Agreement, we invert the usual injunctive relief analysis. We first address whether Wisdom is likely to show that Appellants breached the LF I Agreement, specifically, section 2.9(v). If answered in the affirmative, we then examine whether such breach constituted irreparable harm for purposes of justifying preliminary injunctive relief.
 
 1. Likelihood of Success
 
 26
 Appellants' principal argument is that there has been no breach of the LF I Agreement because (1) there has been and will be no new agreement between LUSA and an affiliate, and (2) even if one or more new agreements will be entered, such agreements would not be considered "fundamental matters" under section 2.9(v) so that Wisdom could exercise its minority veto power. We hold that the district court's findings are not clearly erroneous and that it did not err when it concluded Wisdom was likely to succeed on the merits of its breach of contract claim. In so holding, we address, and reject, each of Appellants' arguments in turn.
 
 
 27
 
 a. New Agreement(s)
 
 
 
 28
 According to Appellants, neither Wisdom nor the district court identified a specific agreement that has been or will be entered in furtherance of the Beck's integration primarily because no such agreement has been or will be needed. Because LUSA, LF I, Labatt, Interbrew, and Beck are parties to, and operate under, the Labatt Distributor Agreement, the reasoning goes, and this agreement contemplates LUSA distributing "new brands" acquired by Labatt or Interbrew (such as Beck's brands), LUSA need not enter into any new agreement in order to effectuate the Beck's integration. Appellants contend that settling the details of the Beck's integration entails Interbrew, as the ultimate parent of both LUSA and Beck, simply acting unilaterally without the need for formal, commercial agreements. Absent a new agreement between LUSA and one of its affiliates, Wisdom's minority veto power is inapplicable.
 
 
 29
 We reject Appellants' contention that no new agreement has been identified and, particularly, Appellants' implication that failure to identify a specific written document compels the conclusion that no such agreement exists.[6] As we discuss below, the series of events occurring in connection with the Beck's integration, including discussions and negotiations between the parties thereto, supports the district court's finding that one or more agreements (which may not have been independently reduced to writing) have or, in all likelihood, will be entered. And, our caselaw instructs that, at least under New York law, oral agreements are binding and enforceable absent a clear expression of the parties' intent to be bound only by a writing. R.G. Group, Inc. v. The Horn & Hardart Co., 751 F.2d 69, 74-75 (2d Cir.1984). Likewise, an agreement does not lack "formality" simply because the parties may not have reduced its terms to writing.
 
 
 30
 That Wisdom was unable to identify a tangible document resembling an agreement during the abbreviated discovery period establishes nothing. Wisdom's veto power is conditioned only upon LUSA's entry into a related-party agreement, without regard to its form. For guidance, we naturally turn to the operative documents, primarily the LF I Agreement, governed by Delaware law, and the Labatt Distributor Agreement, governed by New York law. As an initial matter, we note that the law of Delaware and New York are identical regarding principles of contract construction, as both follow the common law rule. Thus, under either state's law, each operative agreement in this case is to be construed as a whole, giving full meaning and effect to all unambiguous terms and provisions therein according to their plain meaning and the parties' intent. See Gertrude L.Q. v. Stephen P.Q., 466 A.2d 1213, 1217 (Del.1983) (discussing Delaware law); PaineWebber, Inc. v. Bybyk, 81 F.3d 1193, 1199 (2d Cir.1996) (discussing New York law).
 
 
 31
 The evidence supports the district court's finding that LUSA entered into an agreement (albeit not resulting in a written document) in furtherance of the Beck's integration. Reading the LF I Agreement according to its plain language, section 2.9(v) deems "fundamental" any matter which necessitates LF I or LUSA entering an agreement with an affiliate. After its acquisition by Interbrew, Beck became one such affiliate. Beck, or Interbrew on behalf of Beck, agreed to shift Beck's distribution rights to LUSA and to use the same transfer pricing mechanisms as applied to other Labatt brands. LF I agreed, on behalf of LUSA, to accept those distribution rights. This is made clear by the Resolution itself which specifically "approved, ratified and confirmed" "[t]he addition... of all Beck's brands ... to the Exclusive Distribution Agreement ..." between Labatt (an affiliate) and LUSA. In other words, the Resolution presupposes a prior agreement (separate from the Labatt Distributor Agreement) to integrate Beck's brands into LUSA's portfolio and to adopt the Labatt Distributor Agreement as controlling Beck's distribution arrangement.
 
 
 32
 As we discuss in more detail below, Appellants concede that section 4 of the Labatt Distributor Agreement requires good faith negotiations when a new brand with a significant market presence (like Beck's brands) is sought to be added to LUSA's portfolio. Appellants admit that, presumably prior to presenting and voting on the Resolution, LUSA and Interbrew negotiated in good faith over terms and conditions on which the Beck's brands will be added to LUSA's portfolio and agreed to "add Beck's to the existing [Labatt] Distributor Agreement on the same terms applicable to other brands." Appellants cannot and do not explain why this activity did not amount to making an agreement.
 
 
 33
 Moreover, the Resolution also authorized action in furtherance of the Beck's integration and, at a minimum, contemplated that the parties would execute additional agreements in the course of that integration.[7] Sufficient evidence supports the district court's findings that the Beck's integration necessarily would include other formal, commercial agreements between LUSA and an affiliate, thereby triggering Wisdom's minority veto power in section 2.9(v) of the LF I Agreement. Indeed, LUSA itself characterized the Beck's integration as a significant component of LUSA's planned reorganization and restructuring, which has been described by several witnesses as involving complex and complicated transactions.[8]
 
 
 34
 The testimony of both Bryan Semkuley, LUSA's vice president of marketing, and John Lennon, president of Beck's NA, echo the notion that fully effectuating the Beck's integration either had required, or would likely require in the future, some formal agreement in connection with the transfer of distribution rights, the transfer price, the termination or reassignment of various LUSA and Beck employees, Beck's appointment of LUSA as its United States importer, Beck's reassignment of, and LUSA's acceptance of, Beck's wholesaler agreements,[9] and LUSA's assumption of Beck's media contracts. The shifting of substantial assets, together with evidence regarding the complex reorganization of LUSA in order to accommodate the addition of brands with a "significant market presence" in the United States and to integrate the operations of Beck's NA and LUSA, support the district court's finding that one or more agreements between LUSA and an affiliate have been entered or, in all likelihood, will be entered. As the district court aptly noted at oral argument, such complex matters are not accomplished with the snap of a finger.
 
 
 35
 Appellants concede that the right to distribute Beck's beer and the transfer price associated with this distribution arrangement require an agreement. However, Appellants contend that a new agreement was unnecessary because the Labatt Distributor Agreement, effective since 1994, dictates the terms of the exclusive distribution arrangement, including the transfer price for a new brand. Appellants erroneously assume that LUSA has only one of two choices: (1) to exercise its right of first refusal and decline to act as a new brand supplier's (i.e., Beck) exclusive distributor; or (2) distribute the new brand under the pre-existing Labatt Distributor Agreement. However, under the Labatt Distributor Agreement, if Beck has a "significant market presence," which Appellants concede it does, the parties are required to "negotiate in good faith ... on terms and conditions ... [as the parties] deem equitable and appropriate under the circumstances." Labatt Distrib. Agmt., § 4, at 4-5.[10] By its terms, then, the Labatt Distributor Agreement expressly contemplates that certain parties to a proposed brand integration and distribution arrangement will negotiate (but not necessarily agree upon) whether to use the existing terms of the Labatt Distributor Agreement or to fashion different terms. Thus, LUSA could have negotiated for different terms than those in the Labatt Distributor Agreement.
 
 
 36
 The mere existence of the Labatt Distributor Agreement imposes no obligation to ultimately distribute Beck's brands through LUSA nor does it obviate the need for negotiation and agreement on the precise terms and conditions governing a new distribution arrangement. We find no evidence suggesting that acceptance of the Labatt Distributor Agreement lock, stock, and barrel is a foregone conclusion in a proposed integration of a new brand with a significant market presence. The only circumstance contemplated by the Labatt Distributor Agreement — and one which we find is a foregone conclusion — is that the parties to integration of a new brand with a significant market presence will negotiate in good faith over the terms and conditions of that integration. As in this case, LUSA and Interbrew negotiated, as required, and ultimately agreed to incorporate Beck's brands into LUSA's portfolio on the same terms as applicable to other brands. That constitutes an agreement, at least insofar as is necessary to support the district court's finding that the Beck's integration has required LUSA and an affiliate to enter an agreement. This agreement does not stand alone, however, as the Beck's integration is far from complete. As we stated above, other agreements will, in all likelihood, be necessary.
 
 
 37
 Appellants counter that any such agreements that have been or will be entered are nothing more than informal or "colloquial" agreements, which lack the degree of formality required in order to be covered by section 2.9(v). We disagree. Beneath the simplistic garb in which Appellants adorn the Beck's integration lies a complicated, multi-dimensional endeavor. Fully integrating Beck's brands into LUSA's portfolio is not equivalent to an ordinary, day-to-day business venture by a parent.[11] In addition to striking an agreement regarding the distribution rights and the transfer price, LUSA and an affiliate will need to agree on matters relating to employment downsizing and the reassignment of portions of the workforce, wholesaler contracts, and marketing schemes, which may reasonably be said to be constituent components of the Beck's integration and all of which require more than a waive of the wand. Thus, finalizing the details of any such agreement — involving the integration of business and coordination of nationwide distribution efforts of a major beer supplier — into a workable scheme is a herculean task. The evidence supports the district court's finding that the parties to the transaction have entered or will likely enter one or more agreements in fully effectuating the Beck's integration. We therefore reject Appellants' contention that no new formal agreement has been entered or will be entered in the course of fully effectuating the Beck's integration.
 
 
 38
 
 b. Fundamental Matters
 
 
 
 39
 Appellants contend that, even if a new agreement will be executed during the Beck's integration process, such matters would not be considered "fundamental" within the meaning of section 2.9. The overall plan or scheme of the LF I Agreement, they argue, provides majority rule for all matters arising in the course of managing LF I, except for a narrow subset of issues that are most central to corporate structure and governance. According to Appellants, only agreements involving these basic, i.e. "core," issues of corporate structure and governance — a categorical distinction which excludes matters related to the Beck's integration — are considered "fundamental matters" under section 2.9. However, the subject matter of a particular agreement is not dispositive of whether it is deemed a fundamental matter.
 
 
 40
 Based on the evidence in the record regarding the complexity and multi-faceted nature of the Beck's integration, related-party agreements that have been or will be entered in furtherance of the integration might not implicate core issues of corporate structure and governance but would nonetheless be covered by section 2.9(v). The relationship between the parties to a new agreement, rather than the subject matter of the agreement, determines whether Wisdom may exercise its minority veto power under section 2.9(v). Section 2.9(v) provides Wisdom with a defense against self-dealing, related-party agreements and does not limit the exercise of this veto power to only those agreements between related parties that affect the governance or structure of LF I or LUSA. It should be recalled that section 2.9(v) defines as fundamental matters: "the entry by [LF I] or any of its subsidiaries [LUSA] into or material modifications of any agreement with any Member [Labatt] or any of their respective affiliates." LF I Agmt., § 2.9(v).
 
 
 41
 Appellants do not seriously contest that the plain language of section 2.9(v) supports such a reading. Instead, Appellants argue that, despite the plain language, the true meaning can only be gleaned by examining section 2.9(v) in the context of section 2.9 generally, which, they say, pertains exclusively to core matters of corporate structure or governance. To read section 2.9 more broadly, they argue, would be inconsistent with the overall plan or scheme of the LF I Agreement providing for majority rule over the vast majority of business matters. We disagree.
 
 
 42
 Section 2.9 characterizes a number of matters as "fundamental" that arguably implicate core issues of corporate structure or governance, including reduction of LF I's outstanding shares, LF I Agmt., § 2.9(I), changes affecting LF I's Main Business Purpose and other lines of business, id. §§ 2.9(ii) and (iii), mergers and acquisitions above a certain size, id. § 2.9(iv), and LF I pursuing bankruptcy proceedings, id. § 2.9(vii). At the same time, however, section 2.9 also characterizes a number of matters as "fundamental" that do not involve core corporate structure and governance, such as a change in LF I's external auditors, id., § 2.9(vi), allocations of profits and losses, id., § 2.9(ix), and allocation of marketing expenses not consonant with the POM Agreement, id., § 2.9(xiii). Accordingly, restricting section 2.9(v)'s scope to cover only related-party agreements involving purported core issues of corporate structure or governance would deprive Wisdom of the full benefit of its bargained-for minority veto power. We decline the invitation to rewrite the LF I Agreement in this manner.
 
 
 43
 We therefore agree with the district court that section 2.9(v) provides Wisdom with a veto power over the type of related-party, self-dealing agreements associated with the Beck's integration. It follows, then, that approving the Resolution by a simple majority vote and proceeding with the Beck's integration over Wisdom's negative vote breached the LF I Agreement. Accordingly, the district court did not err when it concluded that Wisdom would likely succeed on the merits of its claim.
 
 
 44
 The question then becomes whether the evidence supports the district court's conclusion that Wisdom has demonstrated irreparable harm. We think it does.
 
 2. Irreparable Harm
 
 45
 Appellants maintain that Wisdom failed to establish irreparable harm. Insofar as proceeding with the Beck's integration effectively results in a de-prioritization of Wisdom's brands or lost profits, that harm, of course, translates to damages compensable by a monetary award. We disagree with Appellants, however, that compensable damages which might flow from the breach negate the existence of any irreparable harm because we find the breach itself to constitute a non-compensable injury.[12]
 
 
 46
 We have previously defined "irreparable harm" as certain and imminent harm for which a monetary award does not adequately compensate. Jayaraj v. Scappini, 66 F.3d 36, 39 (2d Cir.1995); see also Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam) (harm must be actual and imminent, not remote and speculative). Thus, only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.
 
 
 47
 In our discussion above regarding Wisdom's likelihood of success on the merits, we found sufficient evidence to support the district court's findings and conclusion that approving the Resolution regarding Beck's integration deprived Wisdom of the right to exercise its minority veto and breached the LF I Agreement. The injury at issue in this case, then, did not merely flow from the breach of the LF I Agreement; the injury was the breach itself. Because the vast majority of LF I's day-to-day business affairs may be conducted with or without the consent of the Wisdom directors, the continued viability of Wisdom's minority veto is critical to defining its precise management role. The right of a minority owner to block certain transactions is strategic: it might well provide present or future leverage between partners and gives the weaker partner the ability to achieve some balancing not always available to it.
 
 
 48
 No differently, Wisdom's right to participate in the management of LF I has intrinsic value. It derives its value as a trump card of sorts, available to Wisdom as a check on Labatt in order to preserve the balance of power in the joint venture. As we have analyzed above, and based on the record evidence, Wisdom expressly negotiated for and received the right to veto certain transactions with which it disagreed before those transactions commenced, a right that is irretrievably lost upon breach, and may not be compensable by non-speculative damages. The only way to render the provision truly viable is to enforce it. Otherwise, the stronger partner can simply ignore the provision and then argue, as Appellants do here, that the deal was a good one and, therefore, no harm, irreparable or otherwise, results.[13] Accordingly, the only available remedy for a breach of this provision is undoing the breach and restoring Wisdom to a pre-breach posture.
 
 
 49
 This is not to say that all bargained-for contractual provisions provide a basis for injunctive relief upon breach or threatened breach; such a broad holding would eviscerate the essential distinction between compensable and non-compensable harm. We hold only that the denial of bargained-for minority rights, standing alone, may constitute irreparable harm for purposes of obtaining preliminary injunctive relief where such rights are central to preserving an agreed-upon balance of power (e.g., preserving the management role of the minority directors) in corporate management. In so holding, we rely on several general principles. First, we note that the denial of a controlling ownership interest in a corporation may constitute irreparable harm. See, e.g., United Acquisition Corp. v. Banque Paribas, 631 F.Supp. 797, 805 (S.D.N.Y.1985) (in action to enjoin defendants from selling all of stock to third parties, then-district judge John M. Walker, Jr. held that plaintiff's inability to gain a controlling interest in the sought-after company constituted irreparable harm, although injunctive relief was ultimately denied after finding no likelihood of success on the merits). Conduct that unnecessarily frustrates efforts to obtain or preserve the right to participate in the management of a company may also constitute irreparable harm. See, e.g., International Banknote Co. v. Muller, 713 F.Supp. 612, 623 (S.D.N.Y.1989) (in action seeking to enjoin enforcement of corporate bylaw limiting time period in which slates of proposed directors must be filed, the court held that frustrating shareholders in an attempt to obtain representation on board of directors constituted irreparable harm).
 
 
 50
 By analogy, a bargained-for minority right to participate in corporate management has value in and of itself and a denial of that right, without more, can give rise to irreparable harm. See Solar Cells, Inc. v. True North Partners, LLC, No. Civ. A. 19477, 2002 WL 749163 at *7-8 (Del.Ch. Apr.25, 2002) (unpublished opinion[14]) (in action to enjoin merger of First Solar LLC with an affiliate of the majority shareholder, the court found irreparable harm resulting from loss of power and participation in management and held that "[t]he right to participate in a management group is a valuable right whether or not that participation includes control of the group."); see also Alcatel Space, S.A. v. Loral Space & Communications Ltd., 154 F.Supp.2d 570, 584 (S.D.N.Y.2001) (holding that loss of certain bargained-for minority rights under an alliance agreement constituted irreparable harm), aff'd by summary order, 25 Fed.Appx. 83 (2d Cir.2002); Davis v. Rondina, 741 F.Supp. 1115, 1125 (S.D.N.Y.1990) (breach of shareholders agreement by excluding minority shareholder from management of the corporation constituted irreparable harm); Street v. Vitti, 685 F.Supp. 379, 384 (S.D.N.Y. 1988) (potential infringement of minority shareholder "voice in management" by majority shareholder constituted irreparable injury).
 
 
 51
 In the circumstances presented in this case, we conclude that denial of Wisdom's minority rights of corporate governance produces a damage that cannot be adequately remedied by a monetary award.[15] For these reasons, we hold the district court did not err by concluding that Wisdom established irreparable harm.
 
 III. CONCLUSION
 
 52
 Based on the foregoing discussion, we find no clear error in the district court's factual findings. We also find the district court did not err in concluding that Wisdom would likely succeed on the merits of its breach of contract claim and that it would sustain imminent and certain irreparable harm if preliminary injunctive relief was not granted. Accordingly, we hold that the district court did not abuse its discretion when it granted Wisdom's motion for a preliminary injunction and, therefore, affirm.
 
 
 
 Notes:
 
 
 [1]
 Labatt's predecessor in interest is John Labatt Limited, a Canadian company whose name appears in various of the operative documents executed in 1994 contained in the record. In order to avoid confusion, all references in this opinion to "Labatt" include references to John Labatt Limited, where appropriate
 
 
 [2]
 LF I is owned 69% by Appellant Labatt Holdings, Inc., and 1% by Labatt Holdings II, Inc., both wholly-owned subsidiaries of Labatt
 
 
 [3]
 LUSA is controlled by LF I, and its officers are appointed by LF I. Accordingly, control over LF I's day-to-day matters provides control over LUSA's day-to-day matters
 
 
 [4]
 LUSA also entered into a substantially identical distributor agreement with FEMSA and its affiliates (including Wisdom)
 
 
 [5]
 Notably, the district court made an express finding that if it erred with respect to this conclusion, then the preliminary injunction should not issue because the impact of the breach would not cause Wisdom to suffer irreparable harm. The district court further noted that monetary damages would be appropriate for any harm that Wisdom might suffer
 
 
 [6]
 Appellants contend that "despite having subpoenaed all current and draft agreements concerning the U.S. distribution of Beck[] from Beck's [NA], and despite having access to all of LUSA's relevant agreements by virtue of [FEMSA's] 30% ownership stake, [Wisdom] never identified (a) any new agreement to be entered into by LUSA with an affiliate in connection with the Beck's addition to LUSA's portfolio, or (b) any existing agreement that would be materially modified."
 
 
 [7]
 Paragraph 2 of the Resolution provides, in pertinent part, that "[a]ny two officers or directors of [LF I] are authorized and directed to execute and deliver ... all ... agreements...." Contrary to Appellants' contention, we think this language could reasonably be construed, in light of all the evidence, as establishing that formal agreements were contemplated by the Labatt directors as part of the Beck's integration
 
 
 [8]
 LUSA's Long Range Plan characterizes the Beck's integration as a "merger and restructuring" bearing substantial costs to LUSA
 
 
 [9]
 LUSA's Long Range Plan establishes that the Beck's integration raises a host of issues and challenges for LUSA that are not resolvable by the unilateral act of Interbrew. The Long Range Plan acknowledges the substantial number of additional wholesalers that would be added to the LUSA network with the Beck's integration "giving LUSA, temporarily, the largest network in the USA and posing a big consolidation challenge for the company."
 
 
 [10]
 Prior to the controversy over Beck's brands, other brands of LUSA's owners have been added to LUSA without a vote, much less super-majority approval. LUSA has added Interbrew brands to the portfolio of brands that LUSA distributes in the United States, including,e.g., Stella Artois, Hoegaarden, Belle-Vue and Leffe. LUSA commenced distribution of these brands after notice to and without objection from FEMSA, as contemplated by Section 4 of both the Labatt and FEMSA Distributor Agreements.
 
 
 [11]
 That LUSA has previously added other newly acquired brands of LUSA's owners (presumably Interbrew) to LUSA's portfolio "as a matter of course, without any suggestion by any party that the additions required super-majority approval or even a vote," is irrelevant here. Wisdom's prior approval of and/or failure to invoke its minority veto power under section 2.9 neither waives its right to do so at a later time, extinguishes this power, or changes the plain meaning and intent of that section. As the district court noted at oral argument, Wisdom "may well have liked that [prior brand]. This one they don't. This is one they are exercising their rights with respect to."
 
 
 [12]
 As noted above,supra n. 5, the district court explained that Wisdom had not "shown that irreparable harm would flow from the events resulting from the breach." The district court determined that (1) Wisdom had not established that the addition of the Beck's brands to the LUSA portfolio would cause it to lose substantial market share and (2) in any event, any harm that would flow from the Beck's integration "is the type of damage for which monetary damages would be appropriate." Because we find that the breach itself constitutes irreparable harm, we need not reach these issues.
 
 
 [13]
 We find no support for Appellants' suggestion that Wisdom may not exercise its minority veto over matters that are in the best interest of LF I. Appellants draw from the language in the POM Agreement that requires LUSA to employ non-discriminatory, balanced marketing efforts on behalf of all brands it distributes, but ultimately enables it to pursue a marketing scheme that it deems to be in the best interests of LF I. This "best interests of LF I" language has no bearing on Wisdom's minority veto and in no way limits Wisdom's exercise of that veto power
 
 
 [14]
 We find no provision under the Delaware Rules of Court restricting the citation of unpublished opinions for precedential value in opinions. On the contrary, rules expressly permit the citation of unpublished opinions in briefs submitted to various Delaware state courts for this purposeSee Del. R. Sup.Ct. 14(g)(ii); Del. R. Com. Pl. Ct. 107(f).
 
 
 [15]
 In addition to arguing that denying Wisdom the right to exercise its minority veto power over the Beck's integration, if proven, would not itself constitute irreparable harm, Appellants argue that actually proceeding with the Beck's integration would cause no harm, much less irreparable harm, to Wisdom and, in fact, the integration would benefit them. Because it is clear to us that, under the circumstances presented in this case, Wisdom sustained a separate and distinct harm upon denial of the right to exercise its minority veto power in breach of the LF I Agreement, and this harm cannot be adequately remedied by a monetary award, we need not pass on Appellants' other arguments