## GREAT EARTH INTERNATIONAL FRANCHISING CORP.,
Plaintiff,

v.

## MILKS DEVELOPMENTS, INC., RHG Holding Col, Edward Ricciardi and Ted Odd, Defendants.

Great Earth International Franchising Corp., Plaintiff,

v.

1039405 Ontario, Inc., Defendant.

Nos. 01 CIV. 0141(AKH), 02–6194(AKH).

United States District Court, S.D. New York.

Jan. 26, 2004.

Philip S. Ross, Hoffinger Stern & Ross, LLP, New York City, for Plaintiff.

Peter A. Dankin, MCPheters & Dankin, P.C., New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

This consolidated diversity action is before the Court on cross-motions for preliminary injunctive relief. I have heard the motions in Part I owing to the temporary absence from the Courthouse of Judge Hellerstein, to whom the case is assigned.

---

1. Strictly speaking, the defendants are "Former Franchisees," GEIFC having terminated

Trial is scheduled to begin before Judge Hellerstein on April 19, 2004.

## I. BACKGROUND

The parties have executed a Joint Pre-Trial Order. It appears from that document that plaintiff Great Earth International Franchising Corp ("GEIFC") is a franchisor of stores which sell vitamins and dietary supplements under the "Great Earth" trade name. On March 16, 1997, GEIFC and the defendant in case no. 02 Civ. 6194, 1039405 Ontario, Inc. ("Ontario"), entered into a Master Franchise Agreement which licensed Ontario to open Great Earth franchise stores and enter into Sub–Franchise Agreements with other entities in Canada. Ontario entered into sub-franchise agreements with a number of companies and individuals, including the four who are named as defendants in case no. 01 Civ. 0141.

A time came when GEIFC terminated the Master Franchise Agreement with Ontario, and also terminated the Sub–Franchise Agreements with the four defendants. Thereafter GEIFC sued the four defendants in 01 Civ. 0141, and sued Ontario in case 02 Civ. 6194. The present cross-motions involve only 01 Civ. 0141, and for the sake of convenience I will refer to the four defendants in that case as "the Franchisees." [1]

In 01 Civ. 0141, plaintiff GEIFC claims that the defendant Franchisees breached their Sub–Franchise Agreements in various ways, to GEIFC's financial detriment. The Franchisees have counterclaimed against GEIFC, alleging that GEIFC's wrongful conduct caused them economic damage. The amounts of damages claimed by the parties are substantial.

their franchises during the course of the contentious events that precipitated this action.

Two motions, fully submitted, are presently pending undecided before Judge Hellerstein. In one motion, GEIFC moves to dismiss the Franchisees' fraud claim, on the ground that the pleadings and facts state a claim for breach of contract and not fraud. In the other motion, GEIFC moves *in limine* to preclude the Franchisees from introducing evidence on one of their damages claims, on the grounds that certain damages were not in the contemplation of the parties at the time of contracting, and that the Franchisees' claims for loss of profits are uncertain, speculative, and unenforceable as a matter of law.

It appears from the record on these motions that following a gathering known as a "Great Earth Convention," GEIFC sent a memorandum dated October 23, 2003 (the "October 23 Memo") to all the then-existing Great Earth franchisees. The first substantive paragraph of the October 23 Memo says: "Great Earth Companies would like to extend the offer to all of our franchisees to become licensees." The Memo goes on to describe financial advantages to franchisees who turn themselves into licensees, and undertakes to answer a number of questions that franchisees might have about that change in their status. I need not recite those considerations in detail. The consequence of a franchisee's transformation into a licensee most pertinent to the present motion lies in the fact that the income stream produced by a franchisee's sales of Good Earth products flows to GEIFC, while that produced by a licensee's sales flows to a related company, Great Earth Distribution, Inc. ("GED"). The Franchisees say in their motion papers that GEIFC's only continuing income consists of royalties paid to it by franchisees, based upon the sales of products by franchisees, and that GED, which sells the Good Earth products to franchisees, would receive income generated by licensees' retail sales of the products to consumers. *See* Affidavit of Peter A. Dankin, Esq., verified January 12, 2004, at ¶4. That perception is confirmed by the draft "Franchise Agreement Amendment" which was attached to GEIFC's October 23 Memo to the franchisees. It recites in ¶1 that "[t]he Old Relationship is terminated," and in ¶2 that "[a]s of the Effective Date, all payments made under and pursuant to the license granted to the Licensee hereunder shall be made to GED (the 'Licensor')."

The evidentiary record on these cross-motions, which included testimony by Stephen Stern, who leads a double life as chief operating officer of GEIFC and a partner in the law firm representing it, demonstrates that franchisees have the choice of keeping that status or becoming licensees, and that since GEIFC's tendering that option to Good Earth franchisees in late October 2003, about 40% of the franchisees have converted themselves into licensees.

The concern that these circumstances cause the defendant Franchisees to feel is that the continuing of this income steam diversion away from GEIFC to GED may leave GEIFC without assets and unable to pay all or any part of the judgments which the Franchisees profess themselves to be confident of receiving at the conclusion of the trial before Judge Hellerstein (and after appeals, if any).

That concern prompts the Franchisees' present motion for a preliminary injunction which, if granted, would prohibit GEIFC from continuing to change its business from that of a franchisor to a licensor, prohibit existing franchisors from becoming licensees, and prohibit GEIFC "from diverting franchise and royalty fees from plaintiff to a different, related company or companies." Proposed Preliminary Injunction, sub-paragraphs (a) and (b). On January 13, 2004, I granted the Franchi-

sees a temporary restraining order to that effect and set the case down for an evidentiary hearing on January 16. That hearing has taken place and counsel have made subsequent oral arguments.

GEIFC has cross-moved for a preliminary injunction in its favor. That cross-motion arises out of the facts, apparently undisputed, that after being terminated as Great Earth franchisees, the defendants began to operate as stores selling the products of GNC, a Good Earth competitor, changing their corporate structure in the process. In those circumstances, GEIFC asks the Court for the following relief, all in the form of preliminary, pre-trial remedies: "Disgorgement of assets which various Defendants transferred from the corporate entities they operated as Great Earth stores to corporate entities they now operate as GNC stores"; "Piercing the corporate veils of all corporations which the Defendants operated as Great Earth stores to enable Great Earth to recover on any judgment it obtains against Defendants"; and the posting by the Franchisees of a $5,000,000 bond "to insure payment of any judgment Great Earth obtains against Defendants and damages incurred by Great Earth in the event a preliminary injunction is granted."

The Franchisees respond that this cross-motion is wholly frivolous, and ask the Court to impose sanctions pursuant to Fed.R.Civ.P.,Rule 11.

## II. DISCUSSION

### A. Standards for Preliminary Relief

■ The standards for granting preliminary relief in this circuit are well settled. A party seeking preliminary injunctive relief must show: (a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently

serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor. *See, e.g., Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33 (2d Cir.1995) (citing cases).

*Doherty,* in its holding and its review of Second Circuit cases, demonstrates that the movant must meet a higher standard when the injunction it seeks is mandatory in nature, rather than prohibitory. "The typical prohibitory injunction is prohibitory and generally seeks only to maintain the status quo pending a trial on the merits." *Doherty,* 60 F.3d at 34. "A mandatory injunction, in contrast, is said to alter the status quo by commanding some positive act." *Id.* (citation omitted). To obtain a mandatory injunction, Second Circuit authority requires "that the movant demonstrate a greater likelihood of success." *Id.* (citation omitted). It is easier to state the difference than to define it. The *Doherty* court acknowledged that "[t]he distinction between mandatory and prohibitory injunctions is not without ambiguities or critics," and "determining whether the status quo is to be maintained or upset has led to distinctions that are more semantic than substantive." *Id.* (citations and internal quotation marks omitted). "Moreover, many mandatory injunctions can be stated in seemingly prohibitory terms," *id.* (citation omitted), and the distinction may be particularly elusive in breach of contract cases:

> Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of "status quo." A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a

breach of contract defendant, any injunction requiring performance may seem mandatory. *Doherty*, 60 F.3d at 34. In *Doherty*, an action by a book publisher against a licensor of children's characters, the Second Circuit held the plaintiff-movant to the heightened standard one provision of its requested preliminary injunction (a requirement that defendant license plaintiff to publish one book featuring the popular Power Rangers characters) was "arguably mandatory," and concluded that plaintiff had met that standard because on the evidentiary record plaintiff had "shown a clear or substantial likelihood of success on the merits." *Id.* at 35, 37.

## B. The Defendant Franchisees' Motion

The parties vigorously debate whether the Franchisees' requested preliminary injunction is mandatory (GEIFC's view) or prohibitory (the Franchisees' view) in nature. It seems to me at least "arguably mandatory," because its practical results would be to require GEIFC to alter its present form franchise agreement from one that does not prohibit a licensor-licensee relationship to one that would preclude it, and to alter GEIFC's business plan status quo in effect since October 2003 by depriving franchisees of the option delineated in the October 23 Memo to change from franchisees into licensees. But I need not pursue the question further because even if I accept the Franchisees' characterization of their requested injunction as prohibitory, and consequently apply the lesser standard for relief, their motion fails.

■ Principally that is because the Franchisees have not made a sufficient present showing of irrevocable harm, a prerequisite for the issuance of a preliminary injunction of any sort. The Second Circuit defines "irreparable harm" as "certain and imminent harm for which a monetary award does not adequately compensate," a demanding standard which requires that the harm "must be actual and imminent, not remote and speculative." *Wisdom Import Sales Company, L.L.C. v. Labatt Brewing Company Ltd.*, 339 F.3d 101, 113 (2d Cir.2003).

In the case at bar, the Franchisees' perception of irreparable harm rests upon three assumptions: (1) they will obtain judgments on their counterclaims which (2) GEIFC will not have sufficient assets to pay and (3) no other member of the Good Earth family of corporations or individuals could be made to pay. While the Franchisees' stated concerns inclined the Court to issue a short-term temporary restraining order, the record has been expanded since then, and I no longer regard their showing of irreparable harm as sufficient.

*Au fond,* the Franchisees are seeking a preliminary remedy analogous to a writ of attachment, whose purpose is to secure any judgment they may recover after trial on their counterclaims against GEIFC. The Franchisees' briefs do not cite any Second Circuit case equating such a perceived need with irreparable harm. The Court's own research has led to a First Circuit case allowing a preliminary injunction to protect a plaintiff's money damages remedy "when it is shown that the defendant is likely to be insolvent at the time of the judgment." *Teradyne, Inc. v. Mostek Corp.*, 797 F.2d 43, 52–53 (1st Cir.1986) (citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 61 S.Ct. 229, 85 L.Ed. 189 (1940)), and to a District of Massachusetts holding that an injunction may be appropriate "where an action for damages would be inadequate because the defendant is insolvent or its assets are in danger of depletion and dissipation." *Fleet Na-*

*tional Bank v. Rapid Processing Co., Inc.,* 643 F.Supp. 1065, 1066 (D.Mass.1986).

Two district courts in this circuit have considered the question: *Transamerica Rental Finance Corp. v. The Rental Experts,* 790 F.Supp. 378 (D.Conn.1992) (Eginton, *J.*) and, very recently, *Pacific Electric Wire & Cable Co., Ltd. v. Set Top International, Inc.,* 2003 WL 23095564, 2003 U.S. Dist. LEXIS 23270 (S.D.N.Y. Dec. 30, 2003) (Keenan, *J.*).

In *Transamerica,* plaintiff entered into a financing agreement with defendant, a rent-to-own business.[2] By 1991 defendant was in default. Plaintiff declared due the entire unpaid principal amount of $408,864.26, sued to collect it, and sought an order enabling it in the interim to take possession of and operate defendant's business. While plaintiff sought that relief under Rule 64, Fed.R.Civ.P., which allows litigants in federal district courts to avail themselves of prejudgment remedies provided by the laws of the forum state, the court sensibly submitted plaintiff's application to "the heightened scrutiny reserved for mandatory injunctions," 790 F.Supp. at 382, and granted the relief. There was little question about success on the merits of plaintiff's claim; the defendant was indisputably in default and the entire amount of its loan obligation had been declared due.[3] As for the injunctive relief sought, while it certainly altered the status quo of defendant's business operations, the court regarded it as appropriate, "due to

the particular nature of the rent-to-own business," since "[i]f Experts rents fewer appliances and has more delinquent receivables, then the value of its business will decline with no other asset disposal." *Id.* at 383.

In *Pacific Electric Wire,* the plaintiff had pledged the shares of one of the plaintiff's corporations to the defendant corporation as collateral for loans from defendant to plaintiffs. Defendant announced its intention to sell some (but not all) of those shares. Plaintiffs sought a preliminary injunction to prevent that sale, on the theory that the sale of a controlling interest in the corporation in question would cause irreparable harm. Defendant cross-moved for preliminary relief. Judge Keenan denied both motions. He first observed that "[b]ecause of the many factual disputes that are present in this case the Court cannot determine which party, if any, is likely to succeed on the merits," and added: "With so many unresolved issues on all sides, serious questions as to the merits are inevitable. However, it is not clear that the balance of hardships tips decidedly in favor of one party over another." 2003 WL 23095564, **5–6, 2003 U.S. Dist. LEXIS 23270, at *15–*16. Turning to irreparable harm in the context of plaintiffs' motion, Judge Keenan stressed the Second Circuit rule that "[f]or injunctive relief, the injury to be prevented must be not only irreparable, but also actual and

---

**2.** In a rent-to-own business, "a proprietor purchases appliances and rents them out to customers for two or three year periods. The customers pay rent in monthly installments, and at the end of the rental period have typically paid three to six times the original purchase price of the appliance. If all monthly payments are made, the customer acquires title to the appliance at the end of the period." *Transamerica,* 790 F.Supp. at 380.

**3.** Defendant counterclaimed on the basis of a conspiracy theory that "Transamerica entered into the underlying loan agreement knowing that Experts was in poor financial condition, and in the expectation that Experts would default on the loan and allow Transamerica to assume the business". *Transamerica,* 790 F.Supp. at 382. "This claim may ultimately prove to have merit," Judge Eginton wrote, "although the record as yet indicates scant support for such assertions." *Id.*

imminent," *id.*, at \*\*5–6, 2003 U.S. Dist. LEXIS 23270, \*16–\*17, and held that plaintiffs had failed to satisfy that requirement, reasoning that "[n]o clear showing has been made by any party that Set Top definitely intends to schedule another sale at that time or at any time in the near future." *Id.*, at \*5–6, 2003 U.S. Dist. LEXIS 23270, \*17. As for the defendant's motion, Judge Keenan acknowledged that irreparable harm may be found "where an action for damages would be inadequate because the defendant is insolvent or its assets are in danger of depletion and dissipation," *id.*, at \*6, 2003 U.S. Dist. LEXIS 23270, \*18 (citing and quoting *Transamerica*, 790 F.Supp. at 381), but rejected that theory in *Pacific Electric* because of the nature of the family of plaintiff corporations:

> APWC is just one member of a large family of corporations of which PEWC is the head. Were APWC Gen'l to strip the asserts of APWC, Set Top could still be returned to the position it previously occupied by an award of monetary damages against the persons or corporations responsible for the stripping.

*Id.* Those words resonate in the case at bar because the present record indicates that the Great Earth corporations are closely related and operate as a single overall commercial unit. Thus the October 23 Memo begins its message to the franchisees with the sentence: "Great Earth *Companies* would like to extend the offer to all of *our* franchisees to become licensees." (emphasis added).

The cited First Circuit cases, *Transamerica*, and *Pacific Electric* all recognize that in principle, a preliminary injunction may be used to prevent a party's making itself judgment-proof by a divestiture or dissipation of assets. In practice, however, the movant must show a particular combination of circumstances which the defendant Franchisees at bar do not achieve. This case more closely resembles *Pacific Electric*, where a preliminary injunction was denied, than it does *Transamerica*, where the injunction was granted. In *Transamerica*, the plaintiff movant's claim was almost certainly meritorious, the defendant corporation was visibly collapsing into economic failure, and there were no other corporations related to defendant that might answer for its debts. That is not the case at bar. In *Pacific Electric*, the merits issues complex and hotly disputed, and there was a family of plaintiff-related companies against whom judgments on defendant's counterclaim might be enforced. That is this case at bar. There is no basis in the record to suggest that a judgment recovered by the Franchisees against GEIFC, if unsatisfied by that company, could not be enforced against other Good Earth companies or officers, through corporate veil-piercing or other procedures. Moreover, there are speculative elements about the Franchisees' inability to collect judgments against GEIFC itself. There is no indication that GEIFC is about to vanish entirely, or remain only as a shell totally devoid of assets. The option of becoming licensees rests solely with the present franchisees, and the evidence suggests that not all of them will transform themselves; to the extent that they do not, the income stream to GEIFC will continue. In addition, GEIFC maintains a mail-order business which is not affected by the change of status proposed to the present franchisees. I do not think that this speculative element is entirely removed by the Franchisees' reliance upon GEIFC's current financials as proof of a future inability to satisfy judgments on the counterclaims.

■ Turning to the other standards for the granting of preliminary relief, counsel

passionately advanced wholly irreconcilable theories of who will win and who will lose at the trial. I am invited to study the briefs submitted on past and pending motions before Judge Hellerstein, and opine on the likelihood of success. I decline to do so. The Joint Pre–Trial Order makes it plain enough that, in Judge Keenan's words in *Pacific Electric*, "many factual disputes" are present in the case and "serious questions to the merits are inevitable." However, unlike *Pacific Electric*, it seems to me plain that the balance of hardships tips decidedly against the Franchisees. The non-imminent and largely speculative nature of the future harm the Franchisees perceive has been noted *supra*. But the granting of the preliminary injunction they seek would force an immediate cessation of GEIFC's licensing program, and deprive the present franchisees of their ability to choose to convert their own business plans to that of licensees: a transformation that is designed, according to the October 23 Memo, to increase the franchisees' revenues. I must consider the interests of the present franchisees, because "[i]n assessing the balance of hardships between plaintiff and defendant, the court must also consider potential harm to the non-parties." 13 *Moore's Federal Practice,* § 65.22[1][e] (3d ed.2003).

The Franchisees say that GEIFC is not entitled to such consideration by a Court sitting in equity because GEIFC, afraid of the Franchisees' counterclaims, concocted its licensing program in bad faith and for the sole purpose of rendering itself judgment-proof. Thus the Franchisees' brief argues at 4:

> It is obvious that the purpose and effect of this attempt to change the franchise agreements GEIFC presently has is to divert all the income that would ordinarily come to GEIFC to GED, thus leaving GEIFC penniless and unable to pay any judgment defendants may ulti-

mately receive from the trial scheduled to commence in April of this year.

Such corporate and commercial villainy may be possible, but I cannot agree it is obvious. Stern's testimony described a non-invidious and commercially plausible reason for the licensing program, namely, to help the franchisees (and through them GEIFC itself) compete more flexibly in a vitamin and health products retail industry increasingly given over to discounting practices.

For the foregoing reasons, the Court will vacate the temporary restraining order obtained by the Franchisees and deny their motion for a preliminary injunction.

## C. GEIFC's Cross–Motion

GEIFC's cross-motion for preliminary relief is without substance and will also be denied. Remedies such as disgorgement of assets and corporate veil-piercing may be appropriate for GEIFC in an effort to collect judgments it may achieve against the Franchisees after the trial, but in large part for the reasons stated in Part II.B., they do not give rise to an entitlement to preliminary relief. There is no authority for requiring the Franchisees to post a bond to secure such possible future judgments. To the extent that GEIFC seeks a bond under Rule 65 to secure it against loss resulting from an improvident grant by this Court of a preliminary injunction to the Franchisees, the motion is mooted by the Court's refusal to grant that injunction.

The Franchisees ask that Rule 11 sanctions be imposed upon GEIFC for making its cross-motion. My practice is to defer all Rule 11 applications to the end of the case. I will adhere to that practice here, and respectfully refer this Rule 11 application to defer to Judge Hellerstein as the trial judge.

## III. CONCLUSION

With respect to the case bearing docket number 01 Civ. 0141(AKH), the Court makes the following Order:

1. The temporary restraining order obtained by the defendants on January 13, 2004 is vacated.

2. The defendants' motion for a preliminary injunction is denied.

3. The plaintiff's cross-motion for preliminary relief is denied.

4. The defendants' application for Rule 11 sanctions against plaintiff for having brought their cross-motion is respectfully referred to Judge Hellerstein.

It is SO ORDERED.