**CDC GROUP PLC, f/k/a Commonwealth Development Corporation, Plaintiff,**

v.

**COGENTRIX ENERGY, INC., The Goldman Sachs Group, Inc., and John Does. 1—10, Defendants.**

**No. 04 Civ. 9892(PKC).**

United States District Court, S.D. New York.

Jan. 21, 2005.

J. Joseph Bainton, John Jongmin Lee, Bainton McCarthy LLC, New York, NY, for plaiuntiff.

## MEMORANDUM AND ORDER

CASTEL, District Judge.

CDC Group plc, ("CDC") commenced this action against Cogentrix Energy, Inc. ("Cogentrix") and The Goldman Sachs Group, Inc.[1] A subsidiary of Cogentrix, Cogentrix International, LTD ("Cogentrix International") is the 65 % owner of the capital stock of La Compãnía de Eletricidad de San Pedro de Macorís, S.A. ("CESPM") which has a concession from the government of the Dominican Republic to design and construct a power plant to generate and sell power (the "Project"). CDC Holdings (Barbados) Limited ("CDC–H"), a subsidiary of CDC, owns the remaining 35% of the shares of CESPM.

CDC, the parent of the minority shareholder, alleges that an imminent sale by Cogentrix of its shares in Cogentrix International would violate a contractual undertaking by the parties that each would continue to own 51% of its interest in its subsidiary for a period of no less than seven years from the commencement of complete commercial operations of the

---

**1.** In December 2003, GS Power Holdings, LLC ("GS Power"), a subsidiary of defendant The Goldman Sachs Group, Inc, acquired the common stock of Cogentrix.

Project. The obligation would expire on March 2, 2009.

On December 16, 2004, plaintiff CDC, on notice to defendants, presented a proposed temporary restraining order. At the time of the application, Cogentrix advised me that no contract had been signed and no closing date had been set, although it did not deny that negotiations for such a sale were underway. I denied the application for a temporary restraining order and set a hearing for January 6, 2005 on plaintiff's motion for a preliminary injunction.

In the interim, on December 23, 2004, Cogentrix, and Cogentrix International entered into a Sale and Purchase Agreement with CESPM Holdings, Ltd. and Basic Energy BVI Ltd. ("Basic Energy"). (Mancini Declaration ¶ 6) The agreement contains an outside closing date of March 25, 2005, subject to certain possible extensions, although the transaction could close before that time. (Mancini Declaration at 3 n. 1) CDC contends that the prospective buyer is owned by financially sound and reliable parties, including Seaboard Corporation, Basic Energy and V.D.M. Inc., an affiliate of Paul Soros Investments. (Mancini Declaration ¶ 10)

On January 6, 2005, I held a hearing on the motion at which three witnesses testified on behalf of the plaintiff. These are my findings of fact and conclusions of law. For the reasons set forth herein, I grant plaintiff's motion.

## I. *Preliminary Injunction Standards*

In this Circuit for an injunction to issue there must be a showing of irreparable harm—"injury for which a monetary award cannot be adequate compensation...." *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). The harm must be actual and imminent. *Id.* In addition, the movant must demonstrate "either (1) likelihood of success on the merits or (2) sufficiently

serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Id.* I will first address the merits-related issues and then consider whether irreparable harm has been proven.

## II. *Probability of Success on the Merits*

### A. *The Letter Agreement*

■ Ordinarily, in a breach of contract action, it makes sense to begin with the choice of law analysis and then turn to a discussion of the underlying claim. This case, however, presents a rather straightforward breach of contract issue and it is useful to begin with the two-page document that is at the center of the controversy. An understanding of the provisions of the agreement will lead to a better understanding of whether the application of the law of any jurisdiction arguably relevant to the dispute could alter the meaning of the agreement's simple terms.

On December 11, 1998, Cogentrix International and CDC–H entered into a shareholder agreement governing their ownership interest in CESPM to which their corporate parents, Cogentrix and CDC, were not parties. It is undisputed that under certain agreements between the two subsidiaries to which the government of the Dominican Republic was a party, Cogentrix International and CDC–H agreed that together they would maintain a 51% ownership interest in CESPM through the seventh anniversary of the commercial operation of the Project. This contractual undertaking did not expressly limit the ability of the corporate parents, Cogentrix and CDC, to transfer their ownership interests.

By separate letter agreement to which only the corporate parents were parties, they agreed not to transfer their owner-

ship in the respective subsidiaries during the same period of time (the "Letter Agreement"). (Ostrowski Declaration Ex. B) From a business standpoint the Letter Agreement made perfect sense: it ensured that each party, Cogentrix and CDC, would have a reliable and stable business partner through the early operational stages of the Project. Either would likely be unwilling to devote capital and resources to a project that had an undesirable partner.

The Letter Agreement provides in relevant part that "both Cogentrix and CFDC commit to retain not less that 51% ownership and control of their respective subsidiaries, [Cogentrix International and CDC–H], through the aforesaid ownership retention period." (Ostrowski Declaration Ex. B) The retention period, as referenced in the preceding sentence is the "7th anniversary of the commercial operation of the Project". The Letter Agreement recites that it is not intended to "restrict any corporate reorganizations or restructurings by either Cogentrix or CDC; provided, however, that at all times through the expiration of the aforementioned retention period both Cogentrix and CDC shall hold, directly or indirectly, a 51% in and control of that entity, whether [Cogentrix International or CDC–H] or affiliates thereof, which hold their respective ownership interest in that Project which is subject to the ownership retention requirements." (*Id.*)

Because the Letter Agreement was solely to protect the respective interests of the corporate parents, it further recites that its terms "shall not be published by either party to any third party, except as required by law, unless mutually agreed, and it does not create any rights for the benefit of any third party." (*Id.*)

The verified complaint alleges that complete commercial operations began on March 2002 and hence the retention period

continues until March 2, 2009. (Complaint ¶ 17) Defendants do not challenge this assertion.

## B. *Choice of Law*

The choice of law rules of the forum state, New York, govern in this diversity action. *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "[T]he first step in any choice of law inquiry is to determine whether there is an 'actual conflict' between the laws invoked by the parties." *Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 81 (2d Cir.2002) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d 219, 223, 597 N.Y.S.2d 904, 905, 613 N.E.2d 936 (1993)). If a conflict is found in substantive law, then, in the absence of an express choice of law provision, New York would apply a "center of gravity" or "grouping of the contacts" approach. *Tri–State Employment Services, Inc. v. Mountbatten Sur. Co., Inc.*, 295 F.3d 256, 260–61 (2d Cir.2002) (citing *In re Allstate Ins. Co.*, 81 N.Y.2d at 227, 597 N.Y.S.2d 904, 613 N.E.2d 936). "[C]ourts may consider a variety of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." *Tri–State Employment Services, Inc.*, 295 F.3d at 261.

Here, the Letter Agreement was drafted on the Charlotte, North Carolina letterhead of Cogentrix and transmitted to CDC in London. The Letter Agreement recites that the agreement will become binding upon the counter-signature of CDC. Andrew Aldridge, to whose attention in London the document was addressed, signed the document on December 23, 1998. CDC is a corporation organized under the laws of the United Kingdom with its principal place of business in London and Co-

gentrix is a corporation organized under the laws of North Carolina with its principal place of business in Charlotte, NC. No conflict has been identified between the laws of the United Kingdom and those of North Carolina on the meaning or enforceability of unambiguous contractual language prohibiting the sale of more that 51% of the shares of a subsidiary during a defined period of time.

Without pointing to any substantive difference between the laws of North Carolina, United Kingdom or New York, plaintiff urges that the Court ought to apply New York law because the parties should be found to have impliedly agreed to a New York choice of law provision. True, the subsidiaries, Cogentrix International and CDC–H, entered into a shareholder agreement that incorporated New York law, but CDC and Cogentrix manifested an intention that the Letter Agreement be a separate contractual undertaking. First, they note that their agreement was not intended to create any enforceable rights by a third party, and second, they agreed that the existence of the agreement would not be "published by either party to any third party" unless otherwise agreed or required by law. It is implausible to conclude, as plaintiff urges, that because the agreement between the subsidiaries contains a New York choice of law provision, the Letter Agreement impliedly does the same.[2] Nevertheless, because there is no identifiable conflict between the laws of these three common-law jurisdictions on the interpretation of the provision at issue, it is an immaterial conflict. Indeed, the usual first step in a New York choice of law inquiry is to determine whether there is an "actual conflict" between the laws invoked by the parties. *See Booking v. Gen'l Star Mgt. Co.,* 254 F.3d 414, 419 (2d Cir.2001) (citing *In re Allstate Ins. Co.,* 81 N.Y.2d at 223, 597 N.Y.S.2d 904, 613 N.E.2d 936).

Cogentrix urges that the law of the Dominican Republic applies because the subject matter of the contract, in its view, is the Project. It further argues that Dominican law is different in material respects from any common law jurisdiction. On both scores, I conclude that defendants' argument fails. It is beyond dispute that, in a very general sense, the Dominican-based Project brought together Cogentrix, CDC and the subsidiaries of each. According to the shareholder agreement, Cogentrix International is a corporation organized under the laws of the Cayman Islands, British West Indies, with its registered offices there. CDC–H is incorporated under the laws of Barbados with its principal place of business located in Barbados. The Letter Agreement concerns one subject—the continued ownership of shares in the subsidiaries by the corporate parents. I cannot conclude on this record that the subject matter of the Letter Agreement—the share ownership in the subsidiaries—is sited in the Dominican Republic. This conclusion is bolstered by the provisions of the Letter Agreement requiring secrecy as to its terms and the express disclaimer that it creates any rights in any third party. It supports the

**2.** Plaintiff also points to the operating agreement for the Project that contains a New York choice of law provision. (Plaintiff Ex. 3) Again, neither of the parties to the Letter Agreement are parties to the operating agreement. Both CDC and Cogentrix are parties to an April 18, 2000 payment guarantee that contains a New York choice of law provision, but this was an agreement with an unaffiliated third-party in order to induce it to enter into a credit agreement. (Plaintiff Ex. 5) While it may be that a contract could impliedly incorporate a choice of law provision contained in another contractual document, I conclude that this plaintiff has failed to establish that parties intended this Letter Agreement to do so.

conclusion that the corporate parents wanted to maintain their distance from the Project and did not want the utility regulators in the Dominican Republic to have any oversight of their private side-agreement restricting a change of ownership.

I have also reviewed the declaration of Sara Sicard Sanchez, a commercial lawyer and member of the Dominican bar since 1993. She points to the important differences between common law and civil code systems.[3] She argues that there are a number of Civil Code concepts recognized in the Dominican Republic that could alter the result of this litigation. I list several cited by Ms. Sicard: (1) "Clauses usual in the contract must be supplied therein, although they are not expressed." (Article 1160); (2) "Whatever is ambiguous must be interpreted according to the usage of the country where the contract is made." (Article 1159); (3) "Agreements bind not only as to what is expressed therein, but further as regards all the consequences which equity, usage, or law attribute to an obligation by its nature." (Article 1135); (4) Agreements "must be executed in good faith" (Article 1134); and (5) "[I]t is necessary to search into the mutual intention of the contracting parties, rather than stop at the literal sense of terms" (Article 1156). Further, Dominican law acknowledges the concept of abuse of rights that may preclude a party from exercising an otherwise legal right with the intention to cause harm to another party. In the context of the proof presented to me, none of these concepts, if they did apply, would alter the finding of probability of success on the merits.

The language of the Letter Agreement is plain and easily understood. It creates a contractual right and does not limit its exercise. It does not provide, as some contracts do, that neither party may transfer a majority of shares to a third party without the other's consent, leaving open questions of whether or not consent may be unreasonably withheld. This agreement contained an unambiguous prohibition on transfers during a defined period of time. In recent weeks CDC has had discussions, as Cogentrix points out, that contemplate circumstances under which they might be willing to forgo enforcement of the provision. This, according to Cogentrix, triggered obligations to diligently pursue negotiations in good faith. Under Cogentrix's "heads-I-win, tails-you-lose" approach, CDC would have acted in bad faith if it had refused to consider any waiver or modification of the Letter Agreement. Conversely, if it entertains any such consideration, then it is encumbered with an obligation to continue such negotiations until concluded to Cogentrix's satisfaction. The Sicard Declaration does not demonstrate that Dominican law requires the foregoing. Measuring the evidence submitted by the parties against the legal standards set forth in the Sicard Declaration would not, at the preliminary injunction stage, alter the result. This conclusion is consistent with the opinion of Adelarda Adames of Headrick Rizik Alvarez & Fernández, a law firm in Santo Domingo, Dominican Republic, submitted on behalf of plaintiff. (Rippy Decl., Ex. C)

To reiterate, I conclude that the laws of the United Kingdom or North Carolina would apply to this controversy and there is no actual conflict on a point material to a disposition of this motion. I further conclude that if New York or Dominican law

---

**3.** See *Curley v. AMR Corp.*, 153 F.3d 5, 14 (2d Cir.1998) ("New York courts do not indulge the presumption that New York law is the same as the law of a civil code country."); *see also Darby v. Societe des Hotels Meridien*, 1999 WL 459816, at *4 (S.D.N.Y. Jun 29, 1999) (concluding that neither party had demonstrated a material difference between the civil code of Brazil and New York law insofar as relevant to the case).

were to apply, the result would be no different—the contract would be enforceable in accordance with its unambiguous terms. Plaintiff has demonstrated a probability that it will prevail at a trial on the merits on its claim that a transfer by Cogentrix would breach the Letter Agreement.

## II. *Irreparable Injury*

■ At the hearing, CDC made an effective and credible evidentiary presentation demonstrating the likelihood of irreparable injury to it if injunctive relief were denied. CDC is a subsidiary of the Commonwealth Development Corporation, which is an entity, owned by the United Kingdom. Its purpose is to invest funds in developing countries to promote economic development. (Tr. 6) Traditionally, it has been a minority investor in enterprises operated by a majority investor. (Tr. 7) CDC describes itself as "exceptionally careful" in the selection of those persons or entities with whom it will make a co-investment and engages in "substantial due diligence" on the co-investor. (Tr. 7) As a government supported initiative, a soured investment tends to undermine public support for its programs and diminishes the receptiveness of developing countries and new majority investors to engage in transactions. CDC appears to rely on the operational expertise of the majority shareholder.

Cogentrix proposes to sell its interest in Cogentrix International to a consortium comprised of Seaboard Corporation, Basic Energy and V.D.M. Inc, an investment vehicle of Paul Soros. Although it called no witnesses, Cogentrix tried to establish that (1) CDC actually was not satisfied with Cogentrix; (2) the consortium would be a suitable co-investor; (3) the management of the project would likely remain unchanged; and (4) CDC had not expressed unalterable opposition to the transfer to the consortium, thereby suggesting a lack of sincerity in its position. Assuming the truth of these propositions, they do not undercut CDC's showing of the likelihood of irreparable injury. CDC bargained to have Cogentrix as the corporate parent of Cogentrix International for a specific duration, the early years of the Project. Cogentrix's desire to effectuate a sale favorable to it is not an occasion to require CDC to incur substantial expenses in conducting due diligence on the members of the consortium. Nor is CDC's position undermined by its willingness to alter its position if its downside risk were protected by guarantees or offset by monetary consideration. It bargained for the status quo and it is entitled to maintain it for the contractual duration, unless and until circumstances demonstrate that its best interests lie in changing its position. As noted earlier, the parties could have bargained for a provision permitting share transfers upon consent that would not be unreasonably withheld. Instead, they agreed to an absolute prohibition during a defined temporal period, followed by an unfettered right to sell to anyone of a party's choosing thereafter.

True, the shareholder's agreement restricts many actions that a majority shareholder could take without a 90% vote of all shareholders, thereby giving CDC–H an effective veto. But the parties to the Letter Agreement recognized that the protections of the shareholder agreement were inadequate to protect against a corporate parent of the majority shareholder who is operationally unknowledgeable, fickle in its commitment to the Project, not proven to be trustworthy or open to distractions from other worldwide business problems. It is not incumbent upon plaintiff to prove the unworthiness of the consortium members in order to enforce the Letter Agreement. Plaintiff has established a factual basis to believe that waivers of loan covenants that are presently needed from con-

struction lenders will be more difficult to secure if the lenders cannot rely on the established track record of the corporate parents of the borrowers. (Tr. 26–31) This forms a part of its showing of irreparable harm.

In *Wisdom Import Sales Co., LLC v. Labatt Brewing Co.*, 339 F.3d 101 (2d Cir.2003), a joint venture partner sued to enforce its minority veto rights. The agreement governing the limited liability company at issue contained certain super-majority provisions that had not been observed. The Second Circuit was faced with the question of whether the district court had properly found that a violation of these provisions would likely result in irreparable harm. The defendant argued that any resulting injury, like any injury to an interest in a commercial enterprise, was compensable in money damages and, hence, an injunction should not have issued. In affirming the district court, the Court did not view the matter so narrowly:

> ... Wisdom expressly negotiated for and received the right to veto certain transactions with which it disagreed before those transactions commenced, a right that is irretrievably lost upon breach, and may not be compensable by non-speculative damages. The only way to render the provision truly viable is to enforce it. Otherwise, the stronger partner can simply ignore the provision and then argue, as Appellants do here, that the deal was a good one and, therefore, no harm, irreparable or otherwise, results. Accordingly, the only available remedy for a breach of this provision is undoing the breach and restoring Wisdom to a pre-breach posture.

*Id.* at 114 (footnote omitted). Except for the fact that an injunction here merely maintains the status quo, much the same may be said here. The only way to render viable the prohibition on either of the cor-

porate parents transferring a majority interest in the subsidiary during the Project period is to enforce it. A post-hoc attempt to calculate the dollar impact on this minority shareholder in a non-public company, during a start-up period, of a wholesale transfer of ownership by the majority shareholder would be exceedingly difficult and open to the assertion that the damages were two speculative.

■ The harm and hardship to Cogentrix in granting a preliminary injunction is not great. An injunction merely preserves the status quo until trial. This is a simple case, discovery need not be protracted and it ought to be capable of being brought to trial without inordinate delay. True, Cogentrix might lose the presently proposed transaction, but there has been no showing that Cogentrix could not achieve a similarly advantageous transaction were it to prevail at trial. In contrast, were an injunction denied and plaintiff later to prevail, Cogentrix, the parent, would have departed the scene and could not readily be brought back into a forced ownership position without incalculable disruption.

## CONCLUSION

Plaintiff has met the standards for issuance of a preliminary injunction and its motion is granted. By January 28, 2005, plaintiff shall submit a proposed order, together with any argument it wishes to present as to the amount of the bond. Defendants may respond by February 4, 2005.

SO ORDERED.