EMPRESAS CABLEVISIÓN, S.A.B.
DE C.V., Plaintiff,

v.

JPMORGAN CHASE BANK, N.A.
and J.P. Morgan Securities
Inc., Defendants.

No. 09 Civ. 9972 (JSR).

United States District Court,
S.D. New York.

Jan. 28, 2010.

**626**

Daniel Paul Cunningham, Judd Robert Spray, Stephen Randall Neuwirth, Quinn Emanuel Urquhart Oliver & Hedges LLP, New York, NY, for Plaintiff.

Amelia Temple Redwood Starr, Davis Polk & Wardwell L.L.P., D. Scott Wise, Davis Polk & Wardwell LLP, Sheldon Leo Pollock, III, Davis Polk & Wardwell LLP, New York, NY, for Defendants.

*MEMORANDUM ORDER*

JED S. RAKOFF, District Judge.

Plaintiff, Empresas Cablevisión, S.A.B. de C.V. ("Cablevisión"), a Mexican telecommunications operator, moves to preliminary enjoin defendants JPMorgan Chase Bank, N.A. and J.P. Morgan Securities Inc. (collectively, "JPMorgan")—which loaned Cablevisión $225 million pursuant to a credit agreement—from proceeding with a transaction under which JPMorgan would sell a 90% "participation" in the loan to Banco Inbursa, S.A. ("Inbursa"). Cablevisión alleges that this transfer to Inbursa-a bank that has common ownership with a major competitor of Cablevisión in the Mexican telecommunications market—violates Cablevisión's right under the cred-

it agreement to veto "assignments" of the loan. After receiving extensive written submissions from both parties, including detailed affidavits and a deposition transcript,[1] the Court held oral argument on December 22, 2009. After careful consideration, the Court grants Cablevisión's motion, based on the following findings and conclusions:

Cablevisión, whose stock is publicly traded on the Mexican stock exchange, provides cable television and other telecommunications services to Mexican consumers. Decl. of Guadalupe Phillips Margain dated 12/3/09 ("Phillips Decl.") ¶ 5, Ex. 1. A majority of Cablevisión's stock is owned by Grupo Televisa, S.A.B. ("Televisa"), also a Mexican telecommunications company. *Id.* ¶ 4, Ex. 1. In December 2007, in order to acquire a company called Bestel, which operated the third-largest nationwide Mexican fiber-optic network, Cablevisión contributed $225 million to a subsidiary holding company named Cablestar, S.A. de C.V. ("Cablestar"). *Id.* ¶ 16. Two of Cablevisión's affiliates, Cablemás and TVI, each contributed $50 million to this transaction. *Id.* To finance this acquisition, Cablevisión, Cablemás, and TVI each entered into loan agreements with JPMorgan for a total of $325 million. *Id.* ¶ 17.[2] As part of this financing of the Bestel acquisition, JPMorgan lent Cablevisión $225 million pursuant to a credit agreement (the "Credit Agreement") and a promissory note. *Id.* ¶ 17, Exs. 8 (Credit Agreement) & 9 (promissory note).

The Credit Agreement contains several restrictive covenants that, among other things, limit Cablevisión's ability to incur

---

1. These materials, which were previously submitted under seal, are hereby unsealed, as are all other papers in this case.

2. Televisa and its affiliates had a longstanding relationship with JPMorgan, as they had previously used JPMorgan's services to borrow under loan facilities, issue and purchase debt securities, enter into derivatives contracts, effect mergers and acquisitions, and make various other investments. Phillips Decl. ¶ 15.

debt, undergo fundamental corporate changes, make investments, sell its assets, accrue capital expenditures, and take on financial leverage. *See* Credit Agreement art. 6. Conversely, the agreement restricts JPMorgan's ability to transfer its obligations and rights as lender to another party in the form of an "assignment"; for instance, the Credit Agreement specifies that the loan cannot be assigned without Cablevisión's prior written consent. *Id.* § 9.04(b)(i). Additionally, the Credit Agreement contains certain limitations on JPMorgan's ability to sell "participations" in the loan, but participations, unlike assignments, may be made without the borrower's consent. Even then, a participation may be sold only if, in substance, the primary relationships between JPMorgan and Cablevisión, as well as JPMorgan's rights and obligations under the agreement, remain unchanged. *Id.* § 9.04(e).

JPMorgan originally intended to syndicate the loan, as Cablevisión was aware at the time the Credit Agreement was negotiated, *see* Phillips Decl. ¶ 19; but JPMorgan did not attempt to do so in 2008 because of the deteriorating condition of the credit markets by that time. Decl. of Jaquelina Truzzell dated 12/16/09 ("Truzzell Decl.") ¶ 8. In early 2009, JPMorgan explored syndicating the loan in cooperation with Televisa to several banks that were acceptable to Televisa, including HSBC, BNP Paribas, and Scotia Bank. *Id.* ¶ 9; Phillips Decl. ¶ 33. However, according to JPMorgan, the terms offered by these banks were not sufficiently definite or attractive to pursue. Decl. of Sheldon L. Pollock dated 12/17/09 ("Pollock Decl.") Ex. A (Dep. of Jaquelina Truzzell, 12/16/09 ("Truzzell Dep.")) 33:18–35:13. Thus, JPMorgan turned its efforts to selling the loan outright to Banco Inbursa, Truzzell Decl. ¶ 10, a Mexican bank controlled by Carlos Slim Helú and his family, Phillips

Decl. Ex. 7. Significantly, Slim also holds a controlling interest in Telmex, a Mexican communications conglomerate that owns over 80% of telephone land lines in Mexico and that is seeking to expand into other telecommunications markets. Phillips Decl. Ex. 2, at 9, 12; *id.* Exs. 3–5. Telmex is a primary competitor of Cablevisión. *Id.* ¶ 8; Decl. of Judd Spray dated 12/17/09 ("Spray Decl.") Ex. 4, at JPM–0001670.

There are certain factual disputes—none of which is material to the Court's ruling here—regarding when Cablevisión first learned of JPMorgan's intention to assign the Cablevisión loan to Inbursa. According to hearsay proffered by JPMorgan's representative, Jaquelina Truzzell, JPMorgan employee Gilberto Sotelo had a telephone conversation in March or early April 2009 with Guadalupe Phillips Margain, Televisa's director of risk and finance, in which Sotelo informed her of JPMorgan's desire to market the loan to Inbursa and Phillips told Sotelo that she did not object to such marketing of the loan. Truzzell Decl. ¶ 11; Truzzell Dep. 11:17–12:25. Phillips attests that she has no recollection of that conversation and that she never would have agreed to allow the loan be marketed to Inbursa. Second Decl. of Guadalupe Phillips Margain dated 12/17/09 ("Second Phillips Decl.") ¶ 3. On May 7, 2009, JPMorgan's Raimundo Langlois sent by e-mail to América Castillo, a junior Televisa employee, what was in effect a prospectus for potential assignees and participants in the Cablevisión loan, Phillips Decl. Ex. 24, and the next day, Julian Lautersztain of JPMorgan requested that Castillo execute a letter authorizing Inbursa to obtain a credit bureau report on Cablevisión, *id.* Exs. 25 & 26. Castillo granted this authorization, but, according to Cablevisión, she perceived this request to be routine

and did not understand its significance. *Id.* ¶ 45.

Regardless of when Cablevisión first definitively learned of JPMorgan's negotiations with Inbursa, it is undisputed that such negotiations were underway by March 2009. Among other things, internal JPMorgan e-mails indicate that JPMorgan not only began marketing the loan to Inbursa during this time, but also recognized that Cablevisión might object to such an assignment. Spray Decl. Ex. 5. On May 8, 2009, JPMorgan and Inbursa reached a "handshake" agreement on the basic terms of an assignment of 90% of the loan. Truzzell Dep. 17:6–18:21; *see also* Spray Decl. Ex. 6. This agreement was reached without Cablevisión's consent. Truzzell Dep. 18:22–19:9.

On May 21, 2009, Cablevisión learned from HSBC, which had previously expressed interest in purchasing some of the loan, that the loan was no longer for sale. Phillips Decl. ¶ 47. Televisa's Phillips immediately contacted Sotelo at JPMorgan, who denied that any sale had been effected. *Id.* Later that day, JPMorgan's Lautersztain sent Phillips and others at Televisa a formal request for Cablevisión's consent to the assignment. *Id.* ¶ 48, Ex. 28. The next day, Sotelo telephoned Phillips and requested that Cablevisión immediately consent to the assignment. *Id.* ¶ 49. After Phillips expressed reservations, Sotelo indicated that he had assumed from Televisa's authorization of the credit bureau report that it had no objections to an assignment to Inbursa. *Id.* Phillips responded that this was not the case. *Id.* Later that day, Phillips sent JPMorgan an e-mail stating that Cablevisión would "analyze" this proposed assignment to Inbursa and clarifying that Cablevisión had not yet consented to the assignment. *Id.* Ex. 29.

On June 3, Phillips called Carlos Ruíz de Gamboa of JPMorgan to report that Cablevisión would not consent to the proposed assignment. *Id.* ¶ 51. Gamboa allegedly reacted by threatening to give Inbursa the 90% interest in the form of a "participation." *Id.* Later that day, Phillips sent JPMorgan an e-mail with an attached letter from counsel formalizing Cablevisión's decision. That letter expressed Cablevisión's belief "that it would be inappropriate, and could cause serious harm to our business and our competitive position, if one of our major competitors is allowed to gain access to confidential and competitively sensitive information about us, or to exert any control over our business affairs and hinder the development of our business." *Id.* Ex. 30. The letter also noted that a "participation" of 90% of the loan to Inbursa would be similarly unacceptable and would violate JPMorgan's "duty of good faith" under the Credit Agreement. *Id.* Nonetheless, JPMorgan began negotiations to transfer 90% of the loan to Inbursa in the form of a participation, and these discussions continued throughout June and July until a formal agreement (the "Participation Agreement") between Inbursa and JPMorgan was executed on July 15, 2009. Truzzell Decl. ¶¶ 15–19, Ex. C (Participation Agreement).

At the same time JPMorgan was negotiating the participation with Inbursa, Televisa was exploring purchasing the Cablevisión loan for itself. Cablevisión and Televisa proposed to match any offer by Inbursa for the assignment. Phillips Decl. ¶ 52, Exs. 31–32. Internal Televisa e-mails indicate that Televisa found the terms and credit risk of the loan to be attractive. *See* Pollock Decl. Ex. H. On June 17, JPMorgan's Sjoerd Leenart wrote to Televisa's Salvi Folch that he could not envision any scenario in which JPMorgan would sell to Inbursa at a better price than what Televisa was offering.

Spray Decl. Ex. 9. The next day, Leenart reported that the internal approval process for Televisa's offer had been put on hold, but he gave his "word" that "we are not agreeing to or entering into any transaction with any other party." Phillips Decl. Ex. 33. However, on June 19, Leenart wrote to Folch to argue that a participation to Inbursa would pose no significant risks to Cablevisión and could in fact be beneficial. *Id.* Ex. 34. Folch wrote back, faulting JPMorgan for creating the difficult situation and threatening litigation in the event that Cablevisión assigned or participated the loan to any competitor. *Id.* Ex. 35.

Thereafter, JPMorgan completed the agreement to sell a 90% participation in the loan to Inbursa, despite indications of interest from other banks in purchasing part of the loan. *See* Spray Decl. Ex. 13. Moreover, even after the Participation Agreement was executed on July 15, JPMorgan did not disclose the participation to Cablevisión. Although Cablevisión eventually learned of the agreement (whereupon it promptly commenced this lawsuit), it was only after Cablevisión filed this lawsuit that JPMorgan provided Cablevisión with a copy of the Participation Agreement. *See* Spray Decl. Ex. 14; Phillips Decl. ¶ 64.

Several aspects of the JPMorgan–Inbursa Participation Agreement are pertinent here. *First*, the agreement permits Inbursa to request and receive nearly unlimited information from Cablevisión. To begin with, Inbursa is entitled under the Participation Agreement to receive the following categories of information from Cablevisión: "copies of the Credit Document and any amendments, consents, waivers or notices, or any other material received by the Bank in its capacity as Lender, relating to any of the ... Loan Documents," Participation Agreement § 3.01, and "each exe-

cuted and delivered amendment, waiver or consent in respect of the Loan Documents, the occurrence of any 'Event of Default' of which the Bank gives to the Borrower, [and] its exercise of any rights or remedies against the Borrower in respect of the Credit Document," *id.* § 3.03(c). Further, Section 3.03(b) of the Participation Agreement requires JPMorgan to "endeavor to inform" Inbursa "prior to agreeing to any other amendment, waiver or consent relating to the Loan Documents." Finally, and most importantly, Section 3.01 of the Participation Agreement obligates JPMorgan to

> request from the Borrower (to the extent it is entitled under the Credit Document to do so) and (if and to the extent received by the Bank from the Borrower and subject to Section 4.03 hereof) furnish to the Participant such information concerning the business, affairs or financial condition of the Borrower as the Participant may reasonably request.

In other words, Inbursa can ask JPMorgan to demand virtually any information from Cablevisión that JPMorgan is allowed to request under the Credit Agreement—which is almost anything, *see* Credit Agreement § 9.16—and, as long as JPMorgan and Inbursa (the only parties to the Participation Agreement) agree that the request is "reasonable," JPMorgan must both demand the information from Cablevisión and then turn it over to Inbursa.

At her deposition, JPMorgan's Jaquelina Truzzell, who was involved in negotiating non-price terms of the Participation Agreement, testified that the language obligating JPMorgan to provide Inbursa with "notices, or any other material received by the Bank in its capacity as Lender" was inserted into the agreement at Inbursa's request. Truzzell Dep. 81:11–83:14, 88:6–18. Truzzell's e-mails during the negotia-

tions noted Inbursa's desire to clarify that it "would receive all the information sent by the Borrower." Spray Decl. Ex. 15.

*Second,* the Participation Agreement provides that if an Event of Default occurs under the Credit Agreement, the Participation Agreement "shall be terminated and replaced by an assignment agreement . . . whereupon the Participant shall become a Lender." Participation Agreement § 2.04(d). Truzzell testified that this provision was not part of JPMorgan's standard participation agreement; it was inserted because Inbursa "want[ed] a mechanism by which they can start direct proceedings [against] the Borrower in the case of a breach." Spray Decl. Ex. 16; *see also* Truzzell Dep. 80:12–22. Although Truzzell initially objected that including such a provision would be "contrary to the participation structure," Spray Decl. Ex. 16, nonetheless, after consultation with JPMorgan's legal department, this provision was adopted, Truzzell Dep. 88:19–89:7.

*Third,* Section 2.04(a) of the Participation Agreement gives Inbursa a 90% share not only of Cablevisión's principal and interest payments under the loan, but also of any fees earned by JPMorgan in its capacity as lender. Inbursa negotiated for this provision, which was not in JPMorgan's standard form participation agreement, in order to "receive all the economic benefits generated by the loan." Spray Decl. Ex. 15; *see also* Truzzell Dep. 73:24–74:16.

*Fourth,* Section 5.01 of the Participation Agreement gives Inbursa a right of first refusal with respect to any further transfer of the remaining loan amount held by JPMorgan. Once again, this provision was not part of JPMorgan's standard form agreement. Truzzell Dep. 90:24–91:21.

*Fifth,* while each of the foregoing provisions departs from JPMorgan's standard participation agreement, several sections of the Participation Agreement contain recitals preserving JPMorgan's direct relationship with Cablevisión and its sole discretion with respect to amendments, modifications, or waivers under the Credit Agreement.[3] JPMorgan included these provisions despite Inbursa's initial requests that the parties enter "side letters" that would empower Inbursa with the ability "to make decisions concerning all matters related to the granting of amendments and waivers." Pollock Decl. Ex. F, at 3–5. Truzzell wrote to Inbursa to reject these initial requests, noting that to give Inbursa rights under the Credit Agreement beyond those explicitly provided to participants thereunder "would expose us to legal problems with the Borrower." Truzzell Decl. Ex. B. In other words, JPMorgan apparently believed that these provisions saved the Participation Agreement from being a disguised assignment.

Against this background, the Court turns to Cablevisión's request for a preliminary injunction preventing JPMorgan from effectuating this transfer of the

---

3. The Participation Agreement states that "(except as expressly provided herein) . . . the Participant [shall not] have, by reason of this Agreement, the Participation, any rights with respect to the Credit Document, any other Loan Document or any other extension of credit by the Bank to the Borrower." Participation Agreement § 2.04(b). JPMorgan "may (without the Participant's consent) give or withhold its agreement to any amendments of the Loan Documents or any waivers or consents in respect thereof or exercise or refrain from exercising any other rights or remedies which the Bank may have under the Loan Documents or otherwise (and the sale or granting of the Participation by the Bank shall not limit or otherwise affect its discretion in respect of any of the foregoing) . . . ." *Id.* § 3.03(a).

loan to Inbursa. To obtain such relief, Cablevisión must demonstrate "(1) 'either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor,' and (2) 'irreparable harm in the absence of the injunction.' " *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir.2009) (quoting *County of Nassau, N.Y. v. Leavitt*, 524 F.3d 408, 414 (2d Cir.2008)).

With respect to the merits, Cablevisión's application for a preliminary injunction is premised on the claims that the Participation Agreement is for all relevant purposes a disguised but unconsented-to assignment that breaches Section 9.04(b) of the Credit Agreement or that, at a minimum, the Participation so subverts the purposes underlying Cablevisión's right to veto assignments of the loan as to breach the covenant of good faith and fair dealing implied by law in the Credit Agreement. Section 9.04(b) of the Credit Agreement provides that JPMorgan may not "assign ... all or a portion of its rights and obligations under this Agreement" without Cablevisión's prior written consent—except for in certain specified circumstances, including if an Event of Default occurs. Cablevisión negotiated for and obtained a veto right over assignments in order to protect against the possibility of an unsuitable party being given the rights to enforce restrictive covenants or to receive information under the loan. Phillips Decl. ¶¶ 19–20.

In opposing a preliminary injunction, JPMorgan argues that the Participation Agreement is technically consistent with the Credit Agreement. Superficially, this may be correct. For example, with respect to Cablevisión's concerns about confidential information, the Credit Agreement permits disclosure of information

about the borrower, not just to assignees (who can be vetoed) but also to participants (who cannot), provided that such information is given on a confidential basis. Credit Agreement § 9.16(f)(i). This includes "all information received from the Borrower ... relating to the Borrower, any of its Related Parties or their respective businesses." *Id.* § 9.16. Similarly, there is no express restriction in the Credit Agreement on providing a participant with its pro-rata share of fees received by the lender or an option of first refusal for any further transfer of the loan. Finally, under the Credit Agreement, assignment of the loan without borrower consent is expressly permitted when there is an Event of Default. *Id.* § 9.04(b)(i).

But this narrow focus obscures the gist of Cablevisión's argument, which is that JPMorgan, acting in bad faith, used the guise of a purported "participation" to effectuate what is in substance a forbidden assignment, with unusual provisions demanded by Inbursa that are calculated to give Inbursa exactly what the assignment veto in the Credit Agreement was designed to prevent. JPMorgan thereby violated, at a minimum, the covenant of good faith and fair dealing automatically implied by law in the Credit Agreement.

The Court agrees. Under here-applicable New York law, every contract "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.' " *Dalton v. Educational Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995) (quoting *Kirke La Shelle Co. v. Paul Armstrong Co.*, 263 N.Y. 79, 87, 188 N.E. 163 (1933)). The facts presently before the Court make out a very strong showing that JPMorgan, after failing to obtain Cablevisión's consent to an assignment of 90% of the loan to

Inbursa, negotiated an agreement with Inbursa that, while it took the form of a participation, gave Inbursa much of the substance of the forbidden assignment and purposely undercut what JPMorgan knew the assignment veto was designed to prevent. Such an end-run, if not a downright sham, is not permissible if, as here, it does away with the "fruits" of the contract. *Cf. Metro. Life Ins. Co. v. RJR Nabisco, Inc.,* 716 F.Supp. 1504, 1518 (S.D.N.Y.1989) ("The appropriate analysis ... is first to examine the [relevant contracts] to determine 'the fruits of the agreement' between the parties, and then to decide whether those 'fruits' have been spoiled—which is to say, whether plaintiffs' contractual rights have been violated by defendants.").

Perhaps most telling in this regard is the fact that under the Participation Agreement, Inbursa, a bank under common ownership with Cablevisión's major competitor was given, at Inbursa's request, rights that were not part of JPMorgan's standard participation agreement that enabled Inbursa not just to receive Cablevisión's confidential information but to use JPMorgan as a vehicle for demanding such information on a virtually unlimited basis. *See, e.g.,* Participation Agreement §§ 3.01, 3.03(c).[4]

The problem is compounded when these information-sharing provisions are read in conjunction with the other unusual fea-

tures of the Participation Agreement demanded by Inbursa and granted by JPMorgan. For example, JPMorgan committed to assigning the entire loan to Inbursa in the case of a default under the Credit Agreement. This provision gives Inbursa immense leverage because under the Credit Agreement, an Event of Default takes place if, among other things, Cablevisión fails "to observe or perform any covenant or agreement contained in any Loan Document" and if that failure remains uncured for thirty days. Credit Agreement § 7.01(e). Therefore, under the terms of the Participation Agreement, JPMorgan must request any of Cablevisión's confidential information desired by Inbursa, and any failure by Cablevisión to provide this confidential information could trigger a default, *see id.* § 5.01, and thus precipitate the outright assignment of the loan to Inbursa. In addition, not only does Inbursa receive 90% of the loan's principal and interest payments and 90% of the fees paid to JPMorgan as lender, but also the Participation Agreement gives Inbursa the right of first refusal with respect to any further transfer of the remainder of the loan held by JPMorgan. The fact that these and other provisions were demanded by Inbursa and were not part of JPMorgan's standard participation agreement is further confirmation that this is really a disguised assignment.

4. JPMorgan contends that another provision of the Participation Agreement, Section 4.03, negates any otherwise applicable duty to request or disclose information beyond loan documents and the like pursuant to Section 3.01. Section 4.03 relieves JPMorgan of any obligation to disclose confidential information "except for the documents and information expressly required to be furnished by the Bank under Sections 3.01 and 3.03 [of the Participation Agreement]," and JPMorgan claims that disclosure of "such information concerning the business, affairs or financial condition of [Cablevisión] as [Inbursa] may

reasonably request" is not "expressly required" by Section 3.01. But by its terms, Section 3.01 provides that subject to certain exceptions, including any limitations imposed by Section 4.03—JPMorgan "will request from [Cablevisión] ... and ... furnish to the Participant such information...." Because there is no reason to read this provision's statement of what JPMorgan "will request" as anything but an express requirement, the Court concludes that Section 4.03 does not diminish JPMorgan's obligations to request and furnish information under this provision of Section 3.01.

For the foregoing reasons, the Court concludes that plaintiff has shown a likelihood of success on the merits of its claim that JPMorgan breached its implied covenant of good faith and fair dealing under the Credit Agreement. Further, the Court finds that Cablevisión has shown a likelihood of irreparable harm if preliminary injunctive relief is not granted. Cablevisión has made such a showing here because the aforementioned features of the Participation Agreement emasculate Cablevisión's right to veto assignments of the loan, and this sort of injury is irreparable as a matter of law. *See Wisdom Import Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir.2003). When a party has "expressly negotiated for and received the right to veto certain transactions with which it disagreed before those transactions commenced, a right that is irretrievably lost upon breach, and may not be compensable by non-speculative damages," "the only way to render [such a] provision truly viable is to enforce it." *Id.*; *see also, e.g., CDC Group PLC v. Cogentrix Energy, Inc.*, 354 F.Supp.2d 387, 393–94 (S.D.N.Y. 2005) (applying *Wisdom Import Sales* to find irreparable harm in defendant's efforts to sell majority interest in subsidiary to a third party in violation of a letter agreement barring such a sale for seven years). Moreover, independent of this legal doctrine, there is as a factual matter a strong likelihood of irreparable harm arising from Inbursa's ability to seek and obtain Cablevisión's confidential business information under the Credit Agreement and then use it to Cablevisión's detriment. *See, e.g., Muze, Inc. v. Digital–on–Demand, Inc.*, 123 F.Supp.2d 118, 130–31 (S.D.N.Y.2000) (unauthorized use of proprietary information for competitive advantage held to cause irreparable harm).

Accordingly, JPMorgan is hereby preliminarily enjoined from proceeding with the Participation Agreement, treating that agreement as valid or enforceable, or assigning, participating, or otherwise transferring any interest in its Cablevisión loan to Inbursa. Counsel for the parties are directed to jointly telephone the Court by no later than February 4, 2010 to schedule further proceedings in this case. The Clerk of the Court is directed to unseal all documents previously sealed in this case.

SO ORDERED.